**PPG INDUSTRIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Asahi Glass Co., Ltd., Intervenor–Defendant.**

**Court No. 82–03–00406.**

United States Court of International Trade.

March 11, 1991.

See also 702 F.Supp. 917.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart and David Scott Nance, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, A. David Lafer and Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Craig L. Jackson, Washington, D.C., of counsel, for defendant.

Brownstein Zeidman and Schomer, Irwin P. Altschuler and David R. Amerine, Washington, D.C., for intervenor-defendant.

## MEMORANDUM & ORDER

AQUILINO, Judge:

This consolidated action covers administrative reviews of a finding of dumping of tempered sheet glass from Japan conducted by the International Trade Administration, U.S. Department of Commerce ("ITA") pursuant to 19 U.S.C. § 1675. Upon reassignment of the action to this court, a cross-motion by the defendant was granted, remanding the matter "to permit Commerce to reconsider its position with regard to the scope of Treasury's dumping finding."

### I

During the later administrative-review proceeding, the petitioner had argued that that finding embraced all tempered glass of whatever substrate and size and for whatever use. Alternatively, PPG argued that the finding covered all tempered glass for architectural use. The ITA's response was:

We continue to maintain that the scope of the finding is limited to tempered sheet glass in patio door sizes. With regard to the size limit, we believe the wording of the finding and investigation are clear and we are without power to amend. The manufacturing process is also clearly delimited to sheet glass. Further, Asahi has not imported any architectural sheet glass since 1978.

*Tempered Sheet Glass From Japan; Final Results of Administrative Review and Revocation of Antidumping Finding*, 49 Fed.Reg. 8,975 (March 9, 1984). However, after commencement of the action(s) at bar, counsel for the defendant came to interpose the cross-motion for remand upon the following representation:

After a thorough review of the administrative records filed with this consolidated action, we believe that Commerce's determinations to the effect that Treasury's original dumping finding was limited to importations of tempered sheet glass in patio door sizes may not be supported by substantial evidence in th[os]e records.... [1]

Upon airing of this question on remand, however, the ITA concluded:

After a thorough examination of the administrative records as filed in this case, as well as the entire Tariff Commission hearing transcript, Customs Information Exchange Master Lists, and documents submitted by Asahi, the Department determines that the scope of the dumping finding as issued and administered by the Treasury Department was limited solely to tempered sheet glass in patio door sizes.

Treasury's final determination notice, as well as the description of the product coverage in that notice, specified tempered *sheet* glass; thus, there is no basis for an assertion that the scope included all tempered glass. While Treasury's notice did not specify sizes, the record indicates that Treasury investigated and found sales at less than fair value with respect to patio door sizes only. On the basis of Treasury's findings, as well as the testimony of counsel for petitioner,

---

1. Defendant's Memorandum in Response to Plaintiff's Motion for Judgment Upon Agency Record and in Support of Cross–Motion for Remand, pp. 3–4.

the Tariff Commission also investigated only *tempered sheet glass in patio door sizes.* Since the Commission only found injury as a result of imports of tempered sheet glass in patio door sizes, the scope of the antidumping finding, as indicated further by its administration, was limited to that merchandise.

For investigations conducted by Treasury, the Department is obligated to administer any resulting finding based on *the petition and the scope of the original finding.* In addition, Customs' practice in administering the order is evidence of what Treasury intended. On the basis of an examination of these records, the Department concludes that it has not erred in upholding Treasury's scope determination in subsequent administrative reviews.[2]

The plaintiff has filed a notice of disagreement with this reasoning and a motion for another remand to the ITA.[3]

## II

 The standard for this court's review of the agency's determination is whether it is unsupported by substantial evidence on the record or is otherwise not in accordance with law. Plaintiff's position is that the remand results fail on both counts, arguing that the record shows that tempered sheet glass other than for patio doors is within the finding of dumping or that the issue is ambiguous and, when the ambit of such a finding is unclear, the ITA must apply the criteria specified in *Diversified Products Corporation v. United States,* 6 CIT 155, 572 F.Supp. 883 (1983), to determine its scope.

In that case, the court stated that the ITA is responsible for clarifying, where necessary, the scope of an earlier Treasury

dumping finding. 6 CIT at 160, 572 F.Supp. at 887. The case's context was merchandise which had not been developed by the time of the original investigation, whereupon the ITA had considered five criteria in concluding that that merchandise was within the class or kind covered by the finding, to wit, (1) the general physical characteristics of the merchandise, (2) the expectations of the ultimate purchasers, (3) the channels of trade in which the merchandise moved, (4) the ultimate use of the merchandise, and (5) cost. The court affirmed the agency's reliance on those criteria, in view of the substantial evidence on the record. Recently, in *Smith Corona Corporation v. United States,* 915 F.2d 683, 687 (Fed.Cir.1990), the court of appeals agreed that "these criteria are a sound approach to determining the status of products that have been modified since the time of the investigation and final order." Or, stated another way,

in every scope determination involving a new product, the ITA should examine the product in light of the *Diversified Products* criteria to determine whether the product is of the class or kind of merchandise contemplated by the pertinent antidumping finding.

*Kyowa Gas Chem. Indus. Co. v. United States,* 7 CIT 311, 312, 1984 WL 3729 (1984).

On its face, then, this approach has applied to products which are newly developed or modified and arguably within the realm of merchandise under administrative review. But the record in this action shows that tempered sheet glass existed other than for use in patio doors before or at the time of the commencement of the original Treasury Department investigation.[4]

2. Final Remand Results, pp. 11–12 (emphasis in original).

3. In addition to lengthy papers comprising its motion, the plaintiff has filed motions for oral argument and also to strike specified sections of intervenor-defendant's brief submitted in support of the final remand results.

The quality of the written submissions on each side, however, *obviates any need to burden counsel with oral argument,* while the record

does not support the motion to strike. Hence, plaintiff's motions on these points should be, and they hereby are, denied.

4. Hence, if the original petition herein did not implicate tempered sheet glass in general or at least such glass for all architectural uses, it could have—in contrast, for example, to portable electronic typewriters which were not in existence when the antidumping-duty order covering portable electromechanical typewriters

The defendant relies on these two facts in arguing that it was not required to follow the foregoing approach. In urging the contrary, the plaintiff refers the court to *Floral Trade Council of Davis v. United States*, 13 CIT ——, ——, 716 F.Supp. 1580, 1582 n. 3 (1989), which did note that the *Diversified Products* "type of analysis may be of use to ITA in making scope determinations regarding pre-existing products, especially if ITA is attempting to interpret an ambiguous petition." However, in that case the plaintiff ("FTC") contested the ITA's determination that daisies were not within the scope of antidumping-duty orders covering standard and miniature carnations, standard and pompon chrysanthemums, Alstroemeria, gerberas and gypsophila. In affirming the ITA's decision, the court discussed the matter at length as follows:

FTC appears to argue that because "chrysanthemums" are discussed in its petition for relief as to the seven flowers, and because the word "daisies" is mentioned there, as well as in some questionnaire responses, that all chrysanthemums, including all daisies which fall within the botanical genus "chrysanthemum," are included within the scope of the resulting orders. ITA states that the petition filed by FTC, and the various notices issued by ITA with regard thereto, specifically mention seven flowers, including two types of chrysanthemums, but do not mention "daisies" as a specifically covered flower. As secondary reasons, ITA states that the physical characteristics of pompon and standard chrysanthemums differ from those of "daisies" and that the expectation [*sic*] of ultimate purchasers differ with regard to "daisies" as opposed to "chrysanthemums."

Apparently, marguerite daisies, and perhaps others, are now of concern to FTC. The petition does not specifically discuss marguerite daisies or any other daisy, apart from the previously mentioned gerbera daisies and daisy pompon chrysanthemums. FTC, however, relies heavily on the listing of various daisies in an appendix to the petition ... [wherein] the daisies are listed as part of the overall description of the genus "chrysanthemum." Because FTC in its petition did not discuss daisies in the same way that it discussed the seven flowers to be investigated, ITC had to determine whether the petition implicitly covered daisies. Despite a few minor ambiguities, the petition does not indicate that an investigation of daisies was requested. Furthermore, apart from some isolated and ambiguous references to daisies in several questionnaire responses, the investigation does not deal with "daisies." The court considers it highly inappropriate of FTC to cite the word "daisies" as it refers to daisy-type pompon chrysanthemums in questionnaire responses as if that is a reference to daisies such as marguerites.

It seems odd to the court that the petition and investigation would speak of pompon chrysanthemums, standard chrysanthemums and gerbera daisies (which are in another genus), if all daisies were intended to be covered as part of the chrysanthemum genus. The simple fact is that FTC did not ask for an investigation of every flower that is classified in the chrysanthemum genus. Furthermore, it has not even argued that all of the "daisies" that it wishes investigated are covered by the specific terms "standard chrysanthemums" or "pompon chrysanthemums," which were clearly among the flowers to be investigated. ITA's conclusion that "daisies" were not discussed in the petition is essentially correct. "Daisies" were not discussed as a product to be investigated.

13 CIT at ——, 716 F.Supp. at 1581–82 (footnote omitted).

If, as appears, this is the most recent and best exposition of the kind of problem raised anew herein, it does not lend much support to plaintiff's position on the law.

entered in *Smith Corona* and which therefore hardly could have been either specifically contemplated by the underlying petition or specifically excluded from the scope of that order. *See Smith Corona Corporation v. United States*, 11 CIT 954, 678 F.Supp. 285 (1987).

Of course, this does not mean that analysis of the kind for which the plaintiff prays was precluded, only that, on the record before it, the ITA was not obligated to follow *Diversified Products*. Moreover, while tempered sheet glass may not entail many conceptual variations, it is not *a fortiori* that obligatory application of that case's analytical criteria *viz.* expectations of ultimate purchasers, channels of trade, ultimate use, and cost would have led to the result the plaintiff espouses. Be that as it may, this court is unable to conclude that the agency's scope determination was not in accordance with law.

The plaintiff also refers to *Mitsubishi Electric Corporation v. United States,* 12 CIT ——, 700 F.Supp. 538 (1988), *aff'd,* 898 F.2d 1577 (Fed.Cir.1990). That case, as noted in the *Floral Trade Council* opinion, dealt with the question of whether certain subassemblies of merchandise were properly within the scope of the antidumping investigation. The Court of International Trade, in affirming the ITA's answer of that issue, emphasized that the petitioner had clearly evinced in its petition and the ensuing proceedings an intent that the subassemblies be included. Moreover, the petition had been drawn "in the context of a quickly developing new industry where precise technical language and available knowledge to describe the industry practices and tactical maneuvering of importing was scant or unavailable." 12 CIT at ——, 700 F.Supp. at 554. On appeal, the circuit court added:

> The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the Administration has found lies largely in the Administration's discretion.... That discretion must be exercised in light of all the facts before the Administration and must reflect that agency's judgment regarding the scope and form of an order that will best effectuate the purpose of the antidumping laws and the violation found.

898 F.2d at 1582–83 (citation omitted).

According to the remand results now at bar, the ITA surveyed the entire administrative record, reporting in particular on the petition, the scope of the Treasury Department investigation, the Tariff Commission's injury determination, and the administration of the dumping finding.

From the outset, the stated purpose of PPG's petition was "to furnish ... information pursuant to 19 CFR 53.26 that Japanese tempered (toughened) sheet glass in patio door sizes is ... imported into the United States at unit values which are substantially below 'fair value'...." Subsequent colloquy between counsel for the petitioner and the Commission is quoted in the remand results [pp. 6–7] as follows:

> Commissioner Leonard: And that [U.S.] industry ... would be only that portion of the tempered glass industry that produces patio door glass of certain sizes?
>
> Mr. Stewart: Patio doors— ... we have taken patio doors—the greater part of them standard sizes and the imports consisted entirely of standard sizes.
>
> Commissioner Leonard: And you do not believe that the Commission should consider the industry [to be] the entire domestic tempered glass industry?
>
> Mr. Stewart: No, I do not. No more than you consider in other cases imports of sheet glass in relation to the entire flat glass industry.

Thereafter, the statement of reasons for an affirmative injury determination focused on "[t]empered glass for patio doors, the specific article from Japan sold at LTFV". 36 Fed.Reg. 14,682 (Aug. 7, 1971).

As indicated above, the plaintiff presses the point that the record is ambiguous, and its counsel direct attention to elements which do possess that characteristic. Indeed, one need look no further than the remand results themselves, *e.g.:*

II. *The Scope of Treasury's Investigation*

Treasury's notice of sales at less than fair value was made with respect to "tempered *sheet* glass" (emphasis added) (36 FR 8407, May 5, 1971). As is clear from all its notices in this case, Treasury always specified sheet glass as opposed to all tempered glass.

Although the notices did not specify particular sizes, the investigation was limited to tempered sheet glass in four standard patio door sizes, as is apparent from Asahi's letter to Customs regarding such or similar home market sales [1st Admin. Record, 16, 18]. Treasury makes no mention of tempered sheet glass in other sizes.

See also the discussion of *III. The Tariff Commission's Injury Determination* in the remand results, pages 7–10.

 Ambiguities in records of administrative proceedings of the kind at bar, however, are not unusual, nor do they automatically result in judicial relief for a complaining participant. To repeat, the controlling standard is substantial evidence on the record, and the record before the court contains such evidence in support of defendant's position. As the Supreme Court has stated, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

### III

In view of the foregoing, the court concludes that the ITA's remand results were reached in accordance with law and are supported by substantial evidence on the record, and plaintiff's motion for a second remand must therefore be denied and judgment entered accordingly.

So ordered.