**NITTA INDUSTRIES CORP. and Nitta International, Inc., Plaintiffs–Appellants,**

**and**

**Ernst Siegling and Siegling America, Inc., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant–Appellee.**

**No. 92–1393.**

United States Court of Appeals, Federal Circuit.

June 30, 1993.

John G. DeGooyer, Hopkins & Sutter, Washington, DC, argued for plaintiffs-appellants.

A. David Lafer, Sr. Trial Counsel, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director. Of counsel was Jeffrey B. Denning. Also on the brief were Stephen J. Powell, Chief Counsel for Import Admin. and Berniece A. Browne, Sr. Counsel, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC.

Before NIES, Chief Judge, RICH, and NEWMAN, Circuit Judges.

RICH, Circuit Judge.

Nitta Industries Corp. and Nitta International, Inc. (collectively Nitta) appeal an April 7, 1992 decision of the Court of International Trade (CIT), No. 92–51, sustaining a February 12, 1990 scope ruling by the International Trade Administration of the Department of Commerce (ITA) that nylon core flat belts [1] are covered by an antidumping duty order issued by the ITA on June 14, 1989.[2] For the reasons set forth below, we affirm.

I

The CIT had jurisdiction over Nitta's challenge to the ITA's scope ruling pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) (1988). We therefore have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5) (1988).

The issue before us is whether the CIT erred in sustaining the ITA's scope ruling that Nitta's nylon core flat belts fall within the scope of the ITA's antidumping duty order. In reviewing the ITA's scope ruling, the CIT was guided by a statutory standard of review that provided that the ITA's ruling should be held unlawful if it was "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). To determine whether the CIT correctly applied this standard in reaching its decision, we must apply anew this statutory standard of review to the ITA's ruling and affirm the CIT unless we conclude that the ITA's ruling is not supported by substantial evidence on the record or is otherwise not in accordance with the law. *PPG Indus., Inc. v. United States,* 978 F.2d 1232, 1236 (Fed.Cir.1992); *see also Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1189 (Fed.Cir.1990); *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1559 n. 10 (Fed.Cir.1984). "Substantial evidence is more than a mere scintilla. It means such relevant evidence [considering the record as a whole] as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co., Ltd. v. United States,* 750 F.2d 927, 933 (Fed.Cir. 1984).

II

The antidumping duty order under review states in pertinent part:

1. A nylon core flat belt is a continuous, multilayer strip made up of a core of oriented nylon sheet having on each surface a nylon, fabric or rubber layer.

2. 54 Fed.Reg. 25314 (the ITA published a correction to this order on August 4, 1989, 54 Fed.Reg. 32104, specifically excluding certain belts (not pertinent here) from the scope of that order).

The merchandise covered by this anti-dumping duty order includes industrial belts used for power transmission. These include industrial belts, in part or wholly of rubber or plastic, and containing textile fiber (including glass fiber), or steel wire, cord or strand, and whether in endless (i.e., closed loops) belts, or in belting in lengths or links.

54 Fed.Reg. at 25315.

In its scope ruling holding that nylon core flat belts fall within the scope of this order, the ITA stated:

The written description of scope from the initiation of the investigation through the publication of the antidumping duty order included flat, corded belts.... The written description of the scope remains dispositive, and the [tariff classification numbers] are provided for the convenience of Customs. There is no characteristic or qualification about Nitta's nylon core belt that differentiates it from "flat belts ... containing cord or strand" (54 FR 15486).

ITA Scope Rul. (Feb. 12, 1990). The ITA further stated that, because the product descriptions found in the order and the determinations leading thereto, discussed more fully below, were sufficient to evaluate Nitta's exclusion request, there was no need to look to other factors such as the physical appearance of the merchandise, the ultimate use of the merchandise, the expectations of the ultimate purchaser of the merchandise, or the channels of trade in which the merchandise moves, as in *Diversified Products. Corp. v. United States*, 6 CIT 155, 572 F.Supp. 883, 889 (1983), *modified, Kyowa Gas Chemical Industry Co., Ltd. v. United States*, 7 CIT 138, 582 F.Supp. 887 (1984), to determine whether the order encompasses Nitta's nylon core flat belts.

Nitta, along with plaintiffs-intervenors Ernest Siegling and Siegling America, Inc., challenged the ITA's ruling in the CIT pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c). Each also filed a Rule 56.1 motion for judgment on the agency record.

The CIT denied their motions, sustained the ITA's ruling, and dismissed this action. In effect adopting the ITA's reasoning, the CIT stated in pertinent part at pages 11–12 of its opinion:

from the beginning the ITA stated that the scope of its investigation would cover certain industrial belts for power transmission, including "flat belts, in part or wholly of rubber or plastic, and containing textile fiber (including glass fiber) or steel wire, cord or strand." [citation omitted] Its approach did not waiver and was in accordance with law. When filed, the petition stated that there was "significant overlap" between the categories of industrial belts for power transmission, and the record which developed provides substantial support for this proposition.

### III

Nitta argues that the ITA's scope ruling was unsupported by substantial evidence, and thus, that the CIT erred in sustaining that ruling. We disagree.

The ITA stated at page 1 of its scope ruling that, when determining whether a product is covered by a final antidumping duty order, it first looks to the product descriptions contained in that order, the preliminary and final determinations of the ITA and the International Trade Commission (ITC) leading up to that order, and the petition itself. The ITA further stated that, in the event that it cannot make a scope determination based on this information, it then looks to the *Diversified Products* criteria. Such an analysis finds support in the law, see *Smith Corona Corp. v. United States*, 915 F.2d 683, 685 (Fed.Cir.1990); *SKF USA, Inc. v. United States*, 15 CIT 152, 762 F.Supp. 344, 349, *aff'd*, 972 F.2d 1355 (table) (Fed.Cir. 1992) (only standing issue appealed); *Alsthom Atlantique v. United States*, 787 F.2d 565, 571 (Fed.Cir.1986), and we see no error in the ITA's adoption of this analysis in rendering its scope ruling.[3]

**3.** Of interest, Commerce specifically provided for such an analysis in its recently promulgated regulation 19 CFR § 353.29(i). However, Commerce issued this regulation on March 9, 1990, 55 Fed.Reg. 9046, after the date of the ITA's scope ruling. This regulation was therefore not applicable during any stage of the challenged proceeding.

We also see no error in the ITA's, or the CIT's, application of this analysis to the facts of this case. Both the ITA and the CIT looked to the petition requesting the anti-dumping investigation and the assorted publications leading up to the resulting order to determine whether Nitta's nylon core flat belts fall within the scope of that order. For the reasons set forth below, we find this information to be "such relevant evidence as a reasonable mind might accept as adequate to support" the ITA's scope ruling. *See Matsushita,* 750 F.2d at 933.

In the petition that Gates Rubber Company (Gates) filed with the ITA on June 30, 1988, Gates sought, among other things, the imposition of antidumping duties on imports of "industrial belts, and components and parts thereof, whether cured or uncured, from Japan" and several other countries. Although Gates' petition did not reference specifically nylon core flat belts or list Nitta as a company that it believed was selling imported products at less-than-fair-value (LTFV), the express language in Gates' petition describing the products for which Gates sought an investigation clearly encompassed Nitta's nylon core flat belts.

Furthermore, in both its notice of the initiation of the antidumping duty investigation,[4] published on July 26, 1988, and its notice of its preliminary LTFV determination,[5] published on February 1, 1989, the ITA listed as under investigation, among others, "flat belts, in part or wholly of rubber or plastic, and containing textile fiber (including glass fiber) or steel wire, cord or strand." Nitta's nylon core flat belts clearly fall within the scope of this product description. The ITA also listed in both publications tariff classification numbers that the ITA stated covered the products under investigation. Although there has been some dispute as to whether these classification numbers encompassed Nitta's belts,[6] the ITA noted in each publication that these classification numbers were provided merely for convenience and that the written description of the scope of the investigation was dispositive. In addition, Customs issued a telex on March 8, 1989 indicating that the ITA had expanded the list of tariff classification numbers.[7] It is undisputed that Nitta's nylon core flat belts fall within the scope of one or more of the tariff classification numbers on the expanded list and in the resulting antidumping duty order.

In a March 16, 1989 letter to the ITA, Nitta requested that its nylon core flat belts be excluded from the scope of the ITA's final investigation. Two weeks before the statutory deadline for the ITA to issue its final LTFV determination, Nitta submitted an additional letter to the ITA, dated March 31, 1989, in which Nitta set forth in more detail why it believed its nylon core flat belts should be excluded from the investigation. Nitta argued that these belts were part of a separate "class or kind of merchandise" distinctly different from the other products under investigation. Nitta's arguments focussed on the physical appearance and construction of their belts, the manner in which they were sold, and their interchangeability with the other products under investigation. Nitta also submitted letters from two known domestic producers of nylon core flat belts, J.E. Rhoads & Sons and Shingle Belting, as evidencing that nylon core belting should be excluded from the investigation.

In an April 10, 1989 letter to the ITA, Gates opposed Nitta's attempts to have nylon core flat belts excluded from the scope of the investigation. Gates argued that whether Gates had explicitly identified these belts in its petition was not dispositive, because the ITA had authority to define the scope of the

---

4. 53 Fed.Reg. 28036 (the ITA republished the notice on August 4, 1988, 53 Fed.Reg. 29366, because some paragraphs were printed out of order in the first publication).

5. 54 Fed.Reg. 5114.

6. Nitta argues in this appeal that its nylon core flat belts were not covered by any of the tariff classification numbers in the ITA's notice of the antidumping investigation. The Government counters that Nitta has never explained the basis for this assertion.

7. The telex reiterated that the actual description of the scope of the investigation was controlling, and that the merchandise covered by the investigation included "flat belts, in part or wholly of rubber or plastic, and containing textile fiber (including glass fiber) or steel wire, cord or strand."

antidumping duty investigation [8] and because a class of merchandise includes all species within that class. Not only do we find Gates' arguments persuasive, we also believe that Gates' opposition to Nitta's attempts to exclude its belts at this stage of the investigation evidenced Gates' intent that these belts be covered by the investigation.

In the ITA's notice of its final LTFV determination, published on April 18, 1989,[9] the ITA once again stated that its LTFV investigation covered "flat belts, in part or wholly of rubber or plastic, and containing textile fiber (including glass fiber) or steel wire, cord or strand." As before, the ITA also provided a list of tariff classification numbers covering the products under investigation. Nitta's nylon core flat belts were covered by one or more of these tariff classification numbers. Even so, the ITA noted once more that these classification numbers were provided merely for convenience and that the written description of the scope of the investigation was dispositive. The ITA acknowledged Nitta's requests to exclude its nylon core flat belts from the scope of the investigation, but stated in pertinent part:

> The *information received was insufficient* to determine whether the merchandise is properly excluded from the scope of this investigation. In addition, the information received from these firms [10] arrived too late to be analyzed and verified for this final determination. If the final determination of the ITC results in an antidumping duty order on this merchandise, and upon receipt of proper documentation, the Department may conduct a scope ruling procedure concerning the products imported by these firms. [Emphasis ours.]

54 Fed.Reg. at 15487 (comment 3). The ITA notified the ITC of the ITA's final LTFV determination, and then awaited the ITC's injury determination.

Nitta appeared and participated before the ITC during its injury investigation. Nitta argued that nylon core flat belts were separate like products and that imports of these products did not injure or threaten to injure any domestic industry. Despite Nitta's arguments, the ITC stated in its notice of its final injury determination,[11] published on June 1, 1989, that it had found injury or the threat of injury by the importation of "flat belts, in part or wholly of rubber or plastic, and containing textile fiber (including glass fiber) or steel wire, cord or strand," products which the ITA had found to be sold at LTFV. The ITC also identified as falling within its injury determination belts covered by certain tariff classification numbers, some of which encompassed Nitta's nylon core flat belts. In addition, the ITC noted at pages a–2 to a–5 of its published report of its investigation [12] that flat belts fall into two types, cordless and corded, and that nylon core belting is a prominent type of corded flat belt. Thus, despite Nitta's arguments, the ITC found injury or the threat of injury by nylon core flat belts.

The foregoing clearly illustrates that the written description of the scope of the antidumping investigation encompassed Nitta's nylon core flat belts from the initiation of the investigation through the publication of the resulting order. Nitta's unsuccessful attempts at excluding these belts from both the ITA's LTFV investigation and the ITC's injury investigation further evidence that these belts were considered to be within the scope of the antidumping investigation at all stages of the investigation. Furthermore, we agree with the ITA that it was under no obligation to conduct a *Diversified Products* analysis during its post-order scope determination, given the ITA's unwavering and unambiguous position throughout the antidumping investigation that Nitta's products fell within the scope of that investigation. Accordingly,

---

8. Gates relied upon *Diversified Products*, 572 F.Supp. at 887 and *Royal Business Machines, Inc. v. United States*, 1 CIT 80, 507 F.Supp. 1007 (1980), *aff'd*, 669 F.2d 692 (CCPA 1982) for this proposition.

9. 54 Fed.Reg. 15485.

10. Ernest Siegling and Siegling America, Inc. had also submitted to the ITA their viewpoints as to whether nylon core flat belts and another type of belt, spindle belting, should be excluded from the scope of the investigation.

11. 54 Fed.Reg. 24430.

12. USITC Pub. 2194 (May 1989).

the ITA's scope ruling was supported by substantial evidence, and the CIT did not err in sustaining that ruling.

## IV

■ Nitta argues that, even if the written description of the scope of the antidumping investigation did broadly encompass nylon core flat belts throughout the investigation, the ITA was required nevertheless to conduct a *Diversified Products* analysis in its post-order scope determination, because Gates never intended to include Nitta's nylon core flat belts within the scope of the investigation, and therefore, the description of the class or kind of merchandise used in the investigation was inherently ambiguous. Although Gates did file a letter with the ITA after issuance of the order stating that it never intended its petition to cover Nitta's nylon core flat belts, we find Gates' post-order comments unpersuasive as being contrary to the position that Gates took during the course of the antidumping investigation. During the ITA's LTFV investigation, Gates unequivocally objected to Nitta's attempts to have nylon core flat belts excluded from that investigation, thus evidencing Gates' intention that nylon core flat belts be covered by the antidumping duty investigation initiated by Gates' petition, and consequently eliminating any ambiguity that may have required a *Diversified Products* analysis. Gates' apparent post-order change of heart does not negate Gates' earlier position. Furthermore, given that Gates' comments during the ITA's LTFV investigation eliminated any ambiguity as to the scope of the antidumping duty investigation, Gates' post-order comments are also irrelevant because the ITA can only clarify, not modify, the scope of an existing order. *Alsthom Atlantique*, 787 F.2d at 571. If the domestic industry truly no longer has any interest in maintaining the antidumping duty order against Nitta's nylon core flat belts, then the proper procedure is to institute a "changed circumstances" administrative review pursuant to 19 U.S.C. § 1675(b) and 19 CFR § 353.25(d).

Nitta also argues that the ITA was required under *Floral Trade Council v. United States*, 13 CIT 638, 716 F.Supp. 1580 (1989), to conduct a *Diversified Products* analysis during its post-order scope determination, because the ITA was required to view Nitta's nylon core flat belts as "later-developed products" since neither Gates' petition nor the ITA's LTFV determination specifically mentioned nylon core flat belts. We find this argument unpersuasive for the following reasons. First, Nitta's nylon core flat belts unquestionably existed prior to the commencement of the antidumping investigation, and therefore the ITA was not required to apply a *Diversified Products* analysis to these products.[13] *See SKF*, 762 F.Supp. at 349. Second, it would hardly make sense to require the ITA to view all products not specifically identified in a petition as "later-developed products" requiring a *Diversified Products* analysis.[14] Although the regulations in effect at the time did require some specificity in Gates' petition, see 19 CFR § 353.36 (1988), we agree with the CIT's conclusion at page 8 of its decision that "a petitioner is not required to circumscribe the entire universe of articles which might possibly be covered by the order it seeks." *See American NTN Bearing Mfg. Corp. v. United States*, 14 CIT 320, 739 F.Supp. 1555, 1562 (1990).

## V

■ Nitta also argues that the ITA stated in its final LTFV determination that it was deferring full consideration of Nitta's evidence and arguments presented during the LTFV investigation, i.e., in Nitta's letters dated March 16 and March 31, 1989, to a later scope proceeding. Nitta suggests that, by doing so, the ITA undertook an obligation to conduct a thorough review of this informa-

---

13. Although some cases have suggested that the ITA may elect to apply the *Diversified Products* analysis to a pre-existing product, see *Floral Trade*, 716 F.Supp. at 1582 n. 3, the ITA is clearly not obliged to do so, especially when no ambiguity is involved as in this case.

14. We note, as of interest, that recently promulgated regulation 19 CFR § 353.29(h) (1990) defines "later-developed products" as products "developed after an antidumping duty investigation is initiated."

tion at a later date, and therefore, the ITA erred in its subsequent scope investigation by simply looking to the product descriptions used in the antidumping investigation without conducting such a review.

We find Nitta's suggestions that the ITA deferred consideration of Nitta's arguments and evidence presented during the LTFV investigation to a subsequent scope proceeding to be contrary to the express language in the ITA's final LTFV determination. The ITA stated that it found the information submitted by Nitta to be insufficient to justify excluding Nitta's nylon core flat belts from the scope of its investigation. Clearly, the ITA considered Nitta's information, but found it by itself to be unpersuasive. The ITA's statement that it also did not have time to verify the information submitted was merely an acknowledgment that, even if it had found Nitta's information sufficient, which it did not, it did not have adequate time to verify this information.

Furthermore, contrary to Nitta's suggestions, the ITA's reference to a possible later "scope ruling procedure" was not an admission that it had not considered the information provided by Nitta. Rather, the ITA merely noted that, because the information that Nitta had submitted was insufficient by itself to justify excluding Nitta's products, it saw no reason at that time to conduct any additional investigation, but that it would consider conducting a post-order scope investigation in the event that Nitta presented "proper documentation" that such an investigation was warranted. The ITA did not suggest that such an investigation would include a *Diversified Products* analysis. Accordingly, we see no error in the ITA's reliance during its post-order scope investigation upon its previous conclusions regarding the evidence submitted by Nitta during the ITA's LTFV investigation. In addition, the product description in the ITA's final LTFV determination was only one piece of evidence upon which the ITA relied in rendering its scope ruling. Even if this evidence were somehow questionable, the ITA's scope ruling was nevertheless proper as being supported by all of the other evidence discussed in section III of this opinion.

Although guised as an allegation that the ITA deferred rendering a scope determina-

tion based on the information that Nitta submitted during the LTFV investigation until a later date, Nitta's argument is actually a disagreement with the ITA's conclusion during its LTFV investigation that the information submitted by Nitta at that time was insufficient to exclude Nitta's nylon core flat belts from the scope of that investigation. Clearly, the proper avenue for disputing this conclusion was for Nitta to appeal the ITA's final LTFV determination to the CIT within 30 days of the issuance of the antidumping duty order. 19 U.S.C. § 1516a(a)(2)(A)(i)(I). Nitta elected instead to file a scope ruling request with the ITA, and therefore, we do not have before us the issue of whether the ITA's final LTFV determination was proper.

## VI

■ Finally, Nitta argues that the CIT erred in not considering its contentions that the ITA's scope ruling does nothing to protect the domestic industry and that the ITA's decision runs counter to Congress' intent in that it gives an unfair advantage to Swiss manufacturers. These arguments regarding harm are of no avail. The ITC, not the ITA, investigates harm, and, if Nitta had any disputes with the ITC's injury determination, Nitta should have challenged that determination within 30 days of the publication of the antidumping duty order. 19 U.S.C. § 1516a(a)(2)(A)(i)(I). Furthermore, Nitta has failed to cite any support for its proposition that the ITA has authority to exclude a particular product from the scope of an existing order simply because the order may confer a competitive advantage upon another. As stated previously, although the ITA may clarify the scope of a final antidumping duty order, the ITA may not modify the scope of that order. *Alsthom Atlantique,* 787 F.2d at 571.

## CONCLUSION

For the foregoing reasons, the April 7, 1992 judgment of the CIT is

AFFIRMED.